The final matter on our calendar today is number 2016-91, Everard Findlay Consulting v. Republic of Suriname. Good afternoon, Your Honors. Sophan Shaw for Appellant Everard Findlay. In this case, making and breaking a contract for brand development and consulting services with a branding company is commercial activity under the Foreign Sovereign Immunities Act. Branding is a quintessential private sector activity. Private companies enter into these types of contracts all the time, especially today in the age of social media. The district court did not have the benefit of the Pablo Starr case when it concluded otherwise. And that case clarifies that at whatever level this court defines the contract, Suriname engaged in commercial activity here. Whether the activity is defined as making and breaking a contract full stop, whether it's making and breaking a contract for branding and marketing services, or whether it's making and breaking a contract for branding and marketing the Republic of Suriname, all three are activities that private companies routinely engage in. And the text of the Foreign Sovereign Immunities Act actually counsels courts to look at the higher level of generality, to look at the nature of the activities and not the purpose. And that's what the Supreme Court's decision in Weltover says as well. But even at the deepest level of granularity, we can all think of examples from private companies promoting particular countries as destinations. And these companies might have exclusive flight rights to that particular location, such as Delta. The Pablo Starr case is one of the cases, but how about the Cato case? How do you get around Cato? Your Honor, Cato is distinguishable for two reasons. Here, the plaintiff can neither be characterized as a government employee, nor was it contracted to provide services akin to those provided by the plaintiff in Cato. So, in Cato, the plaintiff was an employee of the government who alleged harassment and retaliation. And here, we have a contract, and the injuries alleged arise out of that contract. And on the second point about the activities, the activities in Cato that the plaintiff was engaged in are different than these activities. The plaintiff was going to trade shows and promoting particular products and particular businesses, engaging in business development. Whereas here, our contract is for branding. It's for a country promoting itself. It's self-promotion. And for those reasons, that case is distinguishable. And Pablo Starr explains that distinction to us and makes clear that the situation here is more like that in Pablo Starr, where the Welsh government was promoting itself through the use of those photos. And Surinam does attempt to argue that Everard was an employee of the Surinamese government, but that's not the case under any test. And courts that have analyzed this question about whether someone is an employee or effectively an employee have used – they appear to use the test under the common law of agency, which is, you know, whether Surinam had the right to control the manner and means by which the product is accomplished. And Surinam did not control the manner and means here. Surinam selected the four projects from a menu of 13 options that Everard Finlay offered, and Everard executed the manner and means of the project. And Joint Appendix, page 24, says Everard was responsible for, and I quote, implementing the projects. In cases where courts have found that contractors' employees were effectively employees of the government, for example, in the Lear case, you know, they were integrated with the military in that particular situation they worked directly for. And under the control of the military, they could have been considered military personnel. We're clearly not in that situation here. And even under other tests that might be available under other statutes, Everard was not an employee of Surinam, and Surinam doesn't offer any test under which Everard would be an employee. Doesn't Cato's language suggest that we actually do have to look a little at the purpose of the activity that the Republic is engaged in? The court there seemed to look at the commercial activity as particularly sovereign because they were promoting various businesses, Japanese businesses. And, you know, we have promotion of tourism versus promotion of commerce. One could look at it at that kind of purposive level, and obviously there's a spectrum, or one could look at it in a more granular fashion as providing web services, as you've described it, that any private enterprise would want as well as any public. But didn't Cato take a somewhat, you know, broader view and look more at what the sovereign was aiming to accomplish in deciding whether it was sovereign activity that was covered by the exception to the – or commercial activity covered by the exception or not? Your Honor, I would submit that Cato examined the situation at that level of granularity because it was trying to determine whether the government employee was a, quote-unquote, bona fide civil servant. And we don't have that same inquiry here. Here we have a contract. And cases about contracts, using the plain text of the FSIA, which, you know, counsels that the court is to look at the nature of the activity and not the purpose and the Supreme Court's decision in Weldover, you know, there's a certain level of granularity after which it's inappropriate for a court to examine. But as I said earlier, under any level of granularity, we want to slice it here. The contract was commercial activity. The activity was commercial activity, whether it was contract full stop, the contract for branding, contract for branding the Republic of Suriname. You know, there's no level of granularity at which this contract and this activity is not commercial activity. And I – Yes, Your Honor. So that is Clause 1. And there are actually two separate clauses that provide the required connection with the United States. But I'll focus on Clause 1 for now. So the test is that the commercial activity has substantial contact with the United States. And to Your Honor's question about the specific activities, the House report says that the substantial contact test is met if the activity includes commercial transactions performed even in part in the United States. So to Your Honor's point, the meetings that you discussed, the fact that an official of the Surinamese government came to the United States, substantial contract negotiations were performed here, the contract was signed in New York in the United States, and the fact that Suriname chose to contract with a United States-based entity performing work in the United States, and the contract targeted the United States market. And Suriname was particularly interested in the United States traveler and the United States consumer. And all of that, all of those factors counsel that this was commercial activity carried on in the United States. And there's also Clause 3, which is where an act of a foreign government has a direct effect in the United States. And we also meet that clause as well as an independently sufficient basis for the required connection. And the effect doesn't need to be substantial or foreseeable. It just must simply follow as an immediate consequence of the defendant's activity. And here we have monies that did not appear in the United States. We have the fact that this was a U.S.-based company that suffered a loss. And we also have, as I said earlier, the targeting of United States consumers. And Suriname's act of nonpayment meant that consumers in the United States would not see the products of the contract. I recognize that I'm out of time and I reserve some time for rebuttal. Yes, you have two minutes for rebuttal. We'll turn to Mr. Schachter. Thank you. Thank you. Good afternoon, and may it please the Court, Kenneth Schachter for the Republic of Suriname. Suriname's activities in this case, in which it essentially outsourced to Findlay the quintessentially governmental function of overseeing the promotion of commerce and tourism with Suriname and improving the image of a nation as a whole throughout the world, not just the United States, were, we submit, not commercial activities under the FSIA. This case falls squarely within this court's jurisprudence, holding that activities by a sovereign that are focused on promoting culture and the people and commerce of an entire nation are not commercial. In Cato, in an opinion written by Judge Cabranes, this court held that promoting commerce in this way is a quintessentially governmental, not commercial activity. And this court reiterated that principle only two months ago in a case called Rucoro against Federal Republic of Germany, decided at the end of September. Private parties cannot and do not engage in activities designed to promote the culture, the people, and the commerce of an entire country. Could you pause for a minute? Could you pause for a minute and talk about Pablo Star as well, which, of course, also arose that was a copyright case in the context of the Welsh government wanting to promote itself. That purpose wasn't determinative. What we're enjoying to do is look at the actual conduct and the type of activities that were contracted for, which seem to be web development and branding, advertising, directed at US market, that are the type that are provided to private companies as well as governments or to any entity that wants to establish a media presence. Targeted at the United States. Sure. Why isn't that the right level to look at this activity? Your client engaged in a contract to procure services of a distinctly commercial nature, it seems to me. So tell me why I'm wrong, what I'm missing. Sure. Let me address both aspects of that question, both the nature of the activities, and then I'll address Pablo Star. In terms of the nature of the activities, these were not, as I said, this is not just a branding agreement, very far from it. And this was not the kind of activity that a private party could engage in. A private party cannot write a national theme song. A private party cannot create a distinctive tagline for an entire country like we are Suriname. Let me interrupt for just a second, though. If I want to sell crackers, I hire an advertising company or a web company to write me a jingle and to make an image and develop a plan for making sure the American public knows about my crackers. Why is that any different when you're doing it for a country? Sure. I think it is different if it's an entire country. This is the national identity of an entire country and not merely an attempt to sell a single product. This is an attempt to burnish the image of an entire country in the world community at large. Another important aspect of this case and the agreement is that Finley agreed to serve, and I'm quoting out of the agreement, as the press office of Suriname, creating press releases and content for Suriname. That is outsourcing. That is asking another party to perform what is in our view, respectfully, a governmental function. And that is what distinguishes it from cases like, well, Pavel Star, I think, is a completely different animal. I'll address that in a moment. But it brings it much closer to the realm of cases like Erringer and other cases in which private parties are contracted, are engaged to do governmental activities, in that case a private spy for Monaco of all things. But that was determined by the Ninth Circuit to be a noncommercial governmental activity. Is hiring a spy the same as creating a theme song or a slogan? Well, if all that was involved was a discreet engagement to write a theme song, maybe, maybe not. But this was far more than that. This was to create a theme song, to create a national identity, to create a website, not just for the rest of the world, but for Suriname's own citizens. That's reflected in the materials that we have here. I'm still having difficulty understanding why all of those services couldn't be provided for a private company. They're commercial services. And the only difference here is that the client is a government. And so one can use grander terms to describe creating a national identity. But, you know, Microsoft, I'm sure, uses grand terms about its global presence. Sure, sure. Is there anything about the actual conduct that Everard was hired to do that is distinctive in its substance? Well, again, I think it is because of the nature of the activity. It's not the purpose. It is its nature. It is designed to create an identity for an entire country. And of course, here in this case, the country paid four and a half million dollars to what I think is a very small operation. So that is a big chunk of the budget of a small country for the promotion of commerce and tourism. So this is not a discrete assignment. Yes, you could break it down into creating a nice looking Suriname brand. And if that's all that was involved, perhaps it would be different. But here this is closer to Cato, where you have an individual who is being engaged to promote the country as a whole, not just a single company's fortunes or trade with other individuals. Let me just very briefly address Tablestar. Of course, very different context. And I think maybe the most important thing, apart from the fact that it's a copyright infringement case, was that there was no relationship whatsoever between the photographer and the government of Wales. The government of Wales decided, well, we're just going to use this photograph without that person's permission and we don't have to do it. So so the so the absence of a relationship made a made a huge difference. Countries cannot just appropriate other people's intellectual property to promote their fortunes. Are you saying, are you saying, though, that whenever a foreign government enters into a contract with a U.S. service provider, if it has to do with the country's tourism enterprise or its public presence in the global sphere, that all of those contracts are not going to be enforceable because they're not commercial activity under the FSIA exception? Well, I would be reluctant to to to advocate for such a broad principle. I think so. Well, I think this is a unique case, given the depth of involvement of Mr. Finley in in in this project to do more than just push tourism. This is not solely about pushing tourism. This is about creating an identity for an entire country, creating an entire Internet presence, promoting commerce, promoting tourism, promoting trade, burnishing the identity of a country that had some some image issues in the world. And so that, you know, I think it is far more expensive than than than the run of the mill case. And that's what I think distinguishes it. And by the way, we're not saying the contract wouldn't be enforceable. The only question is whether a U.S. court would have jurisdiction over Suriname. You know, if there's a payment issue there, Suriname courts are capable of processing those those claims as well. I know I'm late on time, so let me just very briefly address the jurisdictional nexus points. There are two theories. And just to reiterate the obvious, it's not enough to say commercial activity. There must be commercial activity that has a nexus to the United States. And that nexus, according to this court in Shapiro and other cases, exceeds the kind of familiar due process type standard that we apply to personal jurisdiction issues. It has to be a tighter nexus. You have a minute left. Thank you very much. And that nexus is absent here under both clause one, which is activity in the U.S. by the by the sovereign or clause three activity outside the U.S. by the sovereign. That has a direct effect here. The focus is on what the what the nature of the action is. That's what the statute says. And that's what this court has said. And where the action is based on a claim of nonpayment. You have to look to where did the nonpayment occur? It's kind of a metaphysical concept. Where did something not happen? Well, it really is the decision not to pay that matters. And in this case, as in the MMA case, as in the Rogers case, the decision not to pay occurred not in the United States, but in Suriname. And so that means that there is no activity in the U.S. You think that that's what Congress intended in enacting 1605? I do. I do think that the nonpayment decision is what it was concerned about. It would be concerned about that would be the action. Well, in this in this genre of case, I think it is. I mean, again, that's what this court said in Rogers and MMA. Those are cases involving nonpayment of bonds. And this court said explicitly that the locus of that activity is where the decision not to pay occurred. And one case was Peru and I forgot the other one. You don't see a different meaningful difference between bonds issued by a sovereign and a commercial contract procured by a sovereign. Not insofar as this issue is concerned. Of course, there are differences. But insofar as the question of the locus of the of the activity, that is the subject matter of the claim, I don't actually see a difference. So thank you very much. Your time has expired. Thank you, Mr. Schachter. We'll hear from this shot who has two minutes of rebuttal. Thank you, Your Honor. Just two quick points. Judge Carney, as you said, private companies can very easily create taglines for countries. And in fact, they often do. As Judge Lynch mentioned at oral argument in Pablo Star, Delta might have exclusive flight rights to Scotland and create a commercial that is entirely about Scotland and its national identity. And a hotel may have an ad for Aruba, you know, come to Aruba. And we have we've all seen these ads. And I would point this court to a number of other cases. One from the D.C. circuit about a contract for technical assistance in consulting services for rural development in Bolivia. That was commercial activity. The you know, the other side spoke about the website for Surinam's own citizen. There's an 11th Circuit case about a contract for providing services, including a database for Honduras to register its aircraft under the Honduran flag. That was still commercial activity. The case about in for providing information that would lead to capture of a fugitive involving Peru. That was also commercial activity. So examples abound where these types of contracts that may promote governmental ideas are are commercial activity. And I also want to address the recoro case, which did not involve the commercial activities exception and had to do with the takings exception under the FSA, which is not an issue here. And the plaintiffs waived the issue of the commercial activities exception at oral argument. And that case is distinguishable for a number of reasons. It involves totally different facts. The plaintiffs there alleged that land, livestock and personal property in what is now Namibia stolen by German authorities were either sold or leased to private parties. And some of this money was used to purchase real property in New York. And these buildings were used in part to house German diplomats. There was no contracting activity involved in that case, as there was here. The German government didn't ask any private company to do anything. It was engaged in direct diplomacy and cultural influence. And ultimately, the question under the FSA is whether this is the type of lawsuit that Congress would have wanted an American court to hear. And where Suriname reached outside of its borders to sign a branding and marketing contract with a private company in the United States, we should not lose sight of that inquiry. Thank you very much. Thank you for your arguments. Thank you. Thank you for your arguments. We have one additional case on our calendar for today. That's Phillips v. Long Island Railroad, number 19-1089. That is being taken on submission. And that concludes our oral arguments for today. The clerk will please adjourn court. Court stands adjourned.